This Opinion Is a
Precedent of the TTAB

Hearing: November 21, 2019                                    Mailed: March 25, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*In re Medline Industries, Inc.*

———

Serial No. 87680078

———

Janet A. Marvel, Seth I. Appel, and Jacquelyn R. Prom, of Pattishall, McAuliffe, Newbury, Hilliard, & Geraldson LLP, for Medline Industries, Inc.

Christopher M. Law, Trademark Examining Attorney, Law Office 103, Stacy Wahlberg, Managing Attorney.

———

Before Zervas, Heasley, and Larkin,
    Administrative Trademark Judges.

Opinion by Larkin, Administrative Trademark Judge:

If this appeal were a movie, it would be entitled "Fifty Shades of Green." Medline

Industries, Inc. ("Applicant") seeks registration on the Supplemental Register of one

of those shades, "the color green (Pantone 2274C),"[1] for "medical examination gloves" in International Class 10.[2] We reproduce the application drawing below:



The Trademark Examining Attorney has refused registration of Applicant's claimed mark under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), based on a likelihood of confusion with another shade, "the color green Pantone 7488U," registered on the Supplemental Register for "gloves for medical use" and "protective gloves for medical use" in International Class 10.[3] We reproduce the registration drawing below:

---

[1] "Pantone" refers to the Pantone Matching System, a commercial color identification system. *See* TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") Section 808.02 (Oct. 2018). The Pantone system is a standardized color reproduction system that assigns numbers and alpha-numeric designations to particular shades of color for identification purposes. As discussed below, Pantone designations are not required to identify particular shades of color, but have been recognized as serving that function. *See In re Thrifty, Inc.*, 274 F.3d 1349, 61 USPQ2d 1121, 1122 (Fed. Cir. 2001); *Covidien LP v. Masimo Corp.*, 109 USPQ2d 1696, 1697 (TTAB 2014).

[2] Application Serial No. 87680078 was filed on November 10, 2017 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on Applicant's allegation of a bona fide intention to use the mark in commerce. The application originally sought registration of the claimed mark on the Principal Register, but was amended to allege use of the mark and to seek registration on the Supplemental Register.

[3] Registration No. 5278439 issued on August 29, 2017.



Applicant argues that consumers are unlikely to be confused as to the source of its gloves and the gloves in the cited registration because the two green shades are noticeably different, there are medical gloves on the market in many shades of green in between (more than 40 shades of green in all), and there are many additional shades of green occurring in nature.[4]

When the Examining Attorney made the refusal final, Applicant requested reconsideration, which was denied. Applicant then appealed. The Examining Attorney and counsel for Applicant have fully briefed the appeal and appeared at an oral hearing before the panel. We reverse the refusal to register.

### I.    Prosecution History and Record on Appeal[5]

We briefly summarize the prosecution history and the record on appeal because they provide useful background to our analysis of the likelihood of confusion refusal.

---

[4] 4 TTABVUE 15-18; 7 TTABVUE 11. Citations in this opinion to the briefs refer to TTABVUE, the Board's online docketing system. *Turdin v. Tribolite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014). Specifically, the number preceding TTABVUE corresponds to the docket entry number, and any numbers following TTABVUE refer to the page number(s) of the docket entry where the cited materials appear.

[5] Citations in this opinion to the application record are to pages in the Trademark Status & Document Retrieval ("TSDR") database of the United States Patent and Trademark Office ("USPTO").

Applicant filed its application on the basis of its alleged intention to use the claimed mark in commerce, and initially sought registration on the Principal Register. In his first Office Action, the Examining Attorney refused registration on the Principal Register under Trademark Act Section 2(d) on the basis of the cited registration,[6] and on the ground that the claimed color mark was not inherently distinctive and had not acquired distinctiveness,[7] and requested, pursuant to Trademark Rule 2.61(b), 37 C.F.R. § 2.61(b), that Applicant provide certain information and documentation regarding its claimed mark.[8] The Examining Attorney made of record a copy of the cited registration,[9] and webpages displaying green medical gloves, including gloves sold by the owner of the cited registration (the "Registrant").[10]

Applicant responded by amending its application to allege use of the claimed mark in commerce and to seek registration on the Supplemental Register.[11] We reproduce below a portion of Applicant's specimen of use in support of both amendments:

---

[6] February 27, 2018 Office Action at TSDR 1-3. The Examining Attorney also noted the pendency of two prior applications to register shades of green for various gloves as possible bars to registration under Section 2(d). *Id.* at TSDR 1, 4-7. These applications were subsequently abandoned. October 2, 2018 Final Office Action at TSDR 1.

[7] February 27, 2018 Office Action at TSDR 1. A single color alone "can never be inherently distinctive," and to obtain registration on the Principal Register, "an applicant must establish that the color has acquired distinctiveness as a mark for the goods." *Milwaukee Elec. Tool Corp. v. Freud Am., Inc.*, 2019 USPQ2d 460354, *6 (TTAB 2019) (citing *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 54 USPQ2d 1065, 1068 (2000)).

[8] February 27, 2018 Office Action at TSDR 1.

[9] *Id.* at TSDR 2-3.

[10] *Id.* at TSDR 8-17.

[11] August 27, 2018 Amendment to Allege Use; August 27, 2018 Response to Office Action at TSDR 1. *See* Trademark Act Section 23, 15 U.S.C. § 1091 (registrations on the Supplemental Register). To be registered on the Supplemental Register, a proposed mark does not have to



Applicant also argued against the Section 2(d) refusal, and provided information and documentation in response to the Examining Attorney's information request.[13] Applicant submitted a brochure showing gloves bearing the claimed mark,[14] as well as numerous webpages showing medical gloves in multiple colors, including various shades of green,[15] and a portion of the file history of the cited registration.[16]

---

be distinctive, but must be of a sort that is at least capable of acquiring distinctiveness. *See, e.g., In re Bush Bros. & Co.*, 884 F.2d 569, 12 USPQ2d 1058, 1059 (Fed. Cir. 1989).

[12] August 27, 2018 Specimen of Use at TSDR 1.

[13] August 27, 2018 Response to Office Action at TSDR 3-5. The information and documentation primarily concerned whether Applicant's claimed color is eligible for registration on the Supplemental Register because it is capable of functioning as a mark, an issue that is not before us on appeal.

[14] *Id.* at TSDR 10-18.

[15] *Id.* at TSDR 19-91.

[16] *Id.* at TSDR 92-108.

The Examining Attorney then issued a Final Office Action in which he accepted Applicant's amendments to allege use and to seek registration on the Supplemental Register, but made final the refusal to register under Trademark Act Section 2(d).[17] Applicant requested reconsideration, again making of record a portion of the file history of the cited registration,[18] as well as a chart of green medical gloves,[19] and webpages displaying the gloves in the chart, including other gloves sold by Applicant.[20] The Examining Attorney denied the reconsideration request,[21] and Applicant appealed.

## II.    Evidentiary Matters

Before proceeding to the merits of the refusal, we address two evidentiary matters. Applicant's appeal brief displays what Applicant describes as "a screenshot from the Pantone 'Color Finder' showing the enormous range of greens available," 4 TTABVUE 10, a hyperlink to the pantone.com website, *id.* at 11, and a hyperlink to the benjaminmoore.com website, which Applicant claims "offers 673 different varieties in its 'family' of greens." *Id.* Applicant also argues in its appeal brief that the "Board can take judicial notice of the various shades of green under Fed. R. Evid. 201," citing a non-precedential Board decision, *In re Pemobi Comercial Exportadora Ltda.*, Serial

---

[17] October 2, 2018 Final Office Action at TSDR 1.

[18] March 11, 2019 Request for Reconsideration at TSDR 11-27. It was unnecessary for Applicant to submit the same portion of the file history twice.

[19] *Id.* at TSDR 28-32. The chart lists more than 40 third-party uses of shades of green for medical gloves, including gloves sold by Applicant.

[20] *Id.* at TSDR 33-143. Applicant's gloves are displayed at TSDR 115-143.

[21] March 13, 2019 Denial of Request for Reconsideration at TSDR 1.

No. 75749063, 2001 WL 1182898 (TTAB Sept. 25, 2001). 4 TTABVUE 11 n.2, 20-25. In its reply brief, Applicant claims that it "does not ask the Board to take judicial notice of the Pantone website or the Benjamin Moore website *per se*," but rather "to take judicial notice of the various shades of green." 7 TTABVUE 11. Applicant argues that "the multitude of greens in the world exist all around us," that a "simple look out the window confirms the many shades of green," and that the "existence of various shades of green is an elemental fact regardless of what one might find on the Pantone website or the Benjamin Moore website." *Id.*

The Examining Attorney objects to the Pantone and Benjamin Moore website excerpts in Applicant's appeal brief on the grounds that they are untimely, and were not properly made of record even if they were timely, and he requests that the Board disregard them. 6 TTABVUE 5.

We sustain the Examining Attorney's objections to the Pantone and Benjamin Moore website evidence. Trademark Rule 2.142(d), 37 C.F.R. § 2.142(d), provides that "[t]he record in an application should be complete prior to the filing of an appeal" and "[e]vidence should not be filed with the Board after the filing of a notice of appeal." "The evidence submitted with Applicant's appeal brief that Applicant did not previously submit during prosecution . . . is untimely and will not be considered." *In re Inn at St. John's, LLC*, 126 USPQ2d 1742, 1744 (TTAB 2018), *aff'd*, 777 F. App'x. 516 (Fed. Cir. 2019).

We also deny Applicant's request that we "take judicial notice of the various shades of green" under Federal Rule of Evidence 201. 4 TTABVUE 11 n.2.[22] Although the Federal Rules of Evidence, which provide for the taking of judicial notice, *see* Fed. R. Evid. 201, do not apply in ex parte appeals, we may use them as guidelines in determining when it is appropriate to take judicial notice. *See* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") Section 1208.04 (June 2019) and cases cited therein (taking judicial notice of encyclopedia entries, census data, and standard reference works, and of commonly known facts (e.g., beer is ordered orally at a restaurant or bar, U.S. means United States)). Even if the "existence of various shades of green is an elemental fact," 7 TTABVUE 11, we cannot judicially notice specific shades based on a "simple look out the window." *Id*. The nature and number of those shades is not "a fact that is not subject to reasonable dispute" because the claimed "various shades of green" are not "generally known" within the Board's jurisdiction, Fed. R. Evid. 201(b)(1), and "a simple look out the window" is not a source from which the asserted facts "can be accurately and readily determined." Fed. R. Evid. 201(b)(2).[23]

---

[22] As discussed and shown below, the record contains numerous examples of the use of various shades of green on medical gloves.

[23] Applicant's reliance on the cited *Pemobi* decision is misplaced. Non-precedential decisions are not binding on the Board, *In re Procter & Gamble Co.,* 105 USPQ2d 1119, 1120-21 (TTAB 2012), but *Pemobi* does not aid Applicant in any event. In that case, the Board took judicial notice that granite comes in a variety of colors, including gray, white, pink, black, and yellow-brown, on the basis of a page from a publication entitled A FIELD GUIDE TO ROCKS & MINERALS, *Pemobi,* 2001 WL 1182898, *2 n.2, holding that the Board "may properly take judicial notice of entries in standard reference works, including encyclopedias, dictionaries, and the like." *Id*. The Board's reliance on this work was more than a "simple look out the window."

### III.  Analysis of Likelihood of Confusion

Section 2(d) of the Trademark Act prohibits registration of a mark that so resembles a registered mark as to be likely, when used on or in connection with the goods or services of the applicant, to cause confusion, mistake, or deception. 15 U.S.C. § 1052(d). "[A] mark on the Supplemental Register can be cited as a basis for refusing registration to another mark under Section 2(d) of the Act." *Otter Prods. LLC v. BaseOneLabs LLC*, 105 USPQ2d 1252, 1254 (TTAB 2012) (citing *In re Clorox Co.*, 578 F.2d 305, 198 USPQ 337, 340 (CCPA 1978)). In "the ex parte context, the [USPTO] does not and cannot question the validity of a mark in a registration cited against another under Section 2(d)." *Id.* at 1256.

Our determination of likelihood of confusion is based on an analysis of all probative facts in the record that are relevant to the likelihood of confusion factors set forth in *In re E.I. DuPont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). We consider each *DuPont* factor for which there is evidence and argument. *See, e.g., In re Guild Mortg. Co.,* 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019). Two key factors in every Section 2(d) case are the similarity or dissimilarity of the marks and the goods or services, because the "fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks." *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976). We also consider the sixth and thirteenth *DuPont* factors in connection with Applicant's argument that there is a "crowded field" of green medical gloves, and that "[g]iven

the myriad third-party uses of various shades of green for medical gloves, there can be no likelihood of confusion" between the claimed marks. 4 TTABVUE 18.

Like a case that the Board decided in 2012, "[t]he present case provides a somewhat unusual likelihood of confusion determination involving the comparison between two color marks." *In re Cook Med. Techs. LLC*, 105 USPQ2d 1377, 1379 (TTAB 2012). The issue is so unusual that *Cook Medical* appears to be the only precedential Board decision deciding the issue of likelihood of confusion between two single-color marks in the nearly 25 years following the Supreme Court's seminal decision in *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 34 USPQ2d 1161, 1162 (1995) (holding that "no special legal rule prevents color alone from serving as a trademark" when color "meet[s] ordinary legal trademark requirements.").

## A. Similarity or Dissimilarity of the Goods and Channels of Trade

We begin with the second and third *DuPont* factors, on which there is no dispute between Applicant and the Examining Attorney. The second factor "considers '[t]he similarity or dissimilarity and nature of the goods or services as described in an application or registration,'" *In re Detroit Athletic Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1051 (Fed. Cir. 2018) (quoting *DuPont*, 177 USPQ at 567), while the third factor "considers '[t]he similarity or dissimilarity of established, likely-to-continue trade channels.'" *Id.* at 1052 (quoting *DuPont*, 177 USPQ at 567). Our analysis under these factors is based on the identifications of goods in the application and the cited registration. *Id.*; *Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1161-63 (Fed. Cir. 2014).

The goods identified in the application are "medical examination gloves," while the goods identified in the cited registration are "gloves for medical use" and "protective gloves for medical use." The Examining Attorney argues without challenge that the goods are legally identical because the "broad wording . . . 'gloves for medical use' and 'protective gloves for medical use'" in the cited registration "presumably encompasses all goods of the type described, including Applicant's narrower 'medical examination gloves.'" 6 TTABVUE 12 (citing *In re Solid State Design Inc.*, 125 USPQ2d 1409, 1412-15 (TTAB 2018) and *Sw. Mgmt., Inc. v. Ocinomled, Ltd.*, 115 USPQ2d 1007, 1025 (TTAB 2015)). We agree that the goods are legally identical, and the second *DuPont* factor thus strongly supports a finding of a likelihood of confusion.

Because the goods are legally identical, and there are no limitations in the respective identifications as to the channels of trade or classes of consumers, we must also presume that the channels of trade and classes of consumers are identical. *In re FabFitFun, Inc.*, 127 USPQ2d 1670, 1672 (TTAB 2018) (citing *In re Viterra, Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012)). The third *DuPont* factor thus also strongly supports a finding of a likelihood of confusion.

### B. The Sixth and Thirteenth *DuPont* Factors

We turn next to the sixth *DuPont* factor, which "'considers the number and nature of similar marks in use on similar goods.'" *Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*, 908 F.3d 1315, 128 USPQ2d 1686, 1693 (Fed. Cir. 2018) (quoting *DuPont*, 177 USPQ at 567). Applicant and the Examining Attorney sharply dispute

the relevance of the record evidence under this factor. Applicant claims that "[n]umerous third parties use different shades of green for medical gloves," 4 TTABVUE 14, that it "has submitted over *40* different green medical gloves that are currently available," and that "many of these are more similar in color to the Registered Mark than [is Applicant's mark]." *Id.* at 15. Applicant argues that "[i]n such a crowded field, 'customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other.'" *Id.* at 14 (quoting J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:85 (5th ed.) ("MCCARTHY")).

We reproduce below some examples of third-party green medical gloves in webpages in the record that are displayed in Applicant's appeal brief at 4 TTABVUE 15-18:[24]

| Name of Gloves | Image of Glove | Citation |
|---|---|---|
| 1st Choice Green Gloves | | March 11, 2019 Request for Reconsideration, Exhibit C, TSDR p. 34 |

---

[24] In its Request for Reconsideration, Applicant provided a "Chart of Disposable Gloves" listing more than 40 such gloves shown in the record, including several of Applicant's own gloves. March 11, 2019 Request for Reconsideration at TSDR 29-32.

| Beesure Forest Green Gloves | | March 11, 2019 Request for Reconsideration, Exhibit D, TSDR p. 36 |
| Boss Green Gloves | | March 11, 2019 Request for Reconsideration, Exhibit E, TSDR p. 38 |
| Condor Fluorescent Green Gloves | | March 11, 2019 Request for Reconsideration, Exhibit F, TSDR p. 40 |
| Eppco Python Green Gloves | | March 11, 2019 Request for Reconsideration, Exhibit G, TSDR p. 42 |

| Gloveworks Green Gloves | | March 11, 2019 Request for Reconsideration, Exhibit H, TSDR p. 44 |
| MCR Safety Green Gloves | | March 11, 2019 Request for Reconsideration, Exhibit I, TSDR pp. 46 – 47 |
| SAS Safety | | March 11, 2019 Request for Reconsideration, Exhibit J, TSDR p. 49 |

| Showa Green Gloves | | March 11, 2019 Request for Reconsideration, Exhibit K, TSDR p. 51 |
| Showa N-Dex Free Neon Green Gloves | | March 11, 2019 Request for Reconsideration, Exhibit L, TSDR p. 53 |

The Examining Attorney argues that "[e]ven though applicant's brief identifies a number of gloves that are green in color, applicant does not establish or otherwise show that any of the manufacturers or providers of these identified gloves use the color green as an identifier of source." 6 TTABVUE 10. He claims that there is no evidence that any of the glove sellers "intend to use the color green as a source identifier, that such manufacturers have made any efforts, whatsoever, to cause consumers to view solely the color green as an identifier of source, and, more importantly, that consumers view the color of these identified gloves as a trademark." *Id*. He concludes that "the record shows only that the applied-for and cited green color marks used on gloves are intended as source identifiers for gloves," and that Applicant "has not shown that the parties' marks are used in a crowded field of green color marks used on gloves such that consumers would distinguish the two marks in question based on small differences in the marks." *Id*.

Applicant responds in its reply brief that "[w]hether some or all of the other producers of green gloves claim trademark rights is beside the point." 7 TTABVUE 9. Applicant cites *In re The Lucky Co.*, 209 USPQ 422 (TTAB 1980), for the proposition that it does not matter whether the third-party uses of green for gloves are intended to provide source identification. *Id*.

The *Cook Medical* decision provides guidance on the proper application of the sixth *DuPont* factor in the context of single-color marks. In that case, the applicant sought registration on the Supplemental Register of "a translucent, iridescent teal color" for guiding sheaths used in medical procedures. *Cook Med.*, 105 USPQ2d at 1378. Registration was refused based on a Principal Register registration of "the color blue" for catheters. *Id*. In affirming the examining attorney's finding of a likelihood of confusion, the Board discussed the sixth *DuPont* factor as follows:

> [T]he absence in the record before us of any third-party use or registration of a color mark in the medical device field tends to show that registrant's mark is unique or at least not coexisting with similar marks in the field. Thus, there is no evidence to indicate that medical professionals who are likely to purchase the involved goods are accustomed to distinguishing between marks based on color, and particularly subtle differences in color.

*Id*. at 1383.

The Board's reference to the absence of "any third-party use or registration of a color mark in the medical device field" sufficient to show that the relevant consumers were able to "distinguish[ ] between marks based on color, and particularly subtle differences in color," *id.*, makes clear that what is relevant, under the sixth *DuPont* factor in single-color cases, is evidence of the existence of third-party marks, not

simply the presence in the marketplace of third-party goods bearing some shade of the color at issue.

The Board's treatment of this factor in *Cook Medical* is consistent with the Federal Circuit's analysis of the sixth *DuPont* factor in cases involving more traditional forms of marks such as words and designs. *See, e.g., Omaha Steaks,* 128 USPQ2d at 1693 ("[t]he purpose of introducing evidence of third-party use is to show that customers have become so conditioned by a plethora of such similar marks that customers have been educated to distinguish between different [such] marks on the bases of minute distinctions.") (internal quotations and quotation marks omitted omitted)); *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.,* 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015) (holding that "evidence of third-party use of similar marks on similar goods can show that customers have been educated to distinguishing between different marks on the basis of minute distinctions") (internal quotation and quotation marks omitted)); *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674-75 (Fed. Cir. 2015) (holding that Board gave inadequate weight to the applicant's "evidence of a fair number of third-party uses of marks containing 'peace' and 'love' followed by a third, product-defining term").

As discussed above, we must assume that the color shown in the cited Supplemental Register registration is capable of functioning as a mark for purposes of its citation against Applicant's claimed mark, *Otter Prods.*, 105 USPQ2d at 1256, but the authorities cited by Applicant do not require us to engage in a similar legal

fiction of assuming that the third-party uses of green in the record also function as or are used or perceived as marks. The portion of MCCARTHY cited by Applicant speaks throughout in terms of third-party "marks," and notes that a "mark that is hemmed in on all sides by similar marks on similar goods or services cannot be very 'distinctive'" because it "is merely one of a crowd of similar marks" and, in the portion quoted by Applicant, that "[i]n such a crowd, 'customers will likely not be confused between any two of the crowd and may have learned to carefully pick out one from the other.'" 4 TTABVUE 14 (quoting MCCARTHY § 11:85). There is no suggestion that decorative or functional uses of colors should be treated as evidence of the existence of a "crowd of similar marks." *Id.*

Applicant accurately quotes the Board's language in *The Lucky Co.* decision that it was "'the common practice among the manufacturers of athletic shoes to place various stripes and bar designs on the sides of their respective shoes as a means of indicating the source of such products **and/or as a decorative feature** thereof.'" 7 TTABVUE 9 (quoting *The Lucky Co.*, 209 USPQ at 423) (emphasis supplied by Applicant). The bolded language, however, must be read in the context of the entire opinion.

The record in *The Lucky Co.* included "copies of numerous applications and registrations for design marks consisting of bars and stripes placed on the sides of athletic shoes," as well as "numerous photographs of athletic shoes with stripe and bar designs which are on display at various business establishments selling such products." *The Lucky Co.*, 209 USPQ at 423. Notwithstanding the Board's reference

to some uses of the designs as involving "a decorative feature," the Board found that the "complete saturation of the market with somewhat similar stripe and bar designs leave[s] applicant, registrant, and **all other manufacturers of athletic shoes engaging in such practice with marks** that are extremely weak and certainly entitled to only a very narrow and limited scope of protection as contended by applicant." *Id.* (emphasis added).[25] It is clear from the decision as a whole that the Board's focus was on the record evidence, including applications to register marks and registrations of marks, and examples showing the use of the third-party designs as marks, not as ornamentation.[26]

None of the third-party green medical gloves in the record are displayed in such a way that green or a particular shade of green is referred to, or is otherwise identified or designated, as a mark. It is thus very unlikely that the colors or shades of green used by third parties on medical gloves would be perceived as marks. *See Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1516-17 (TTAB 2017) (absence of "look-for" advertising significantly contributed to the applicant's failure to establish that its claimed trade dress had acquired distinctiveness); *In re Fantasia Dist., Inc.*, 120 USPQ2d 1137, 1141-42 (TTAB 2016) (advertising touting the "great look" of applicant's repeating pattern supported finding that it was ornamental). *Cf. In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417, 423-24 (Fed. Cir.

---

[25] The section of MCCARTHY cited by Applicant quotes this language from *The Lucky Co.* decision. MCCARTHY § 11:85 & n.5 (quoting *The Lucky Co.*, 209 USPQ at 423).

[26] We note, however, that Board Member Kera concurred in the reversal of the refusal to register "only because I have serious doubt about whether, in the real world, we are dealing with trademarks at all . . . ." *The Lucky Co.*, 209 USPQ at 423.

1985) (the applicant's advertising featuring taglines referring to the color pink, such as "Put your house in the pink" and "Think pink," licensing of the "Pink Panther" mascot, and use of pink promotional items to associate the color with the applicant, were important parts of its showing that pink had acquired distinctiveness as its mark for fiberglass insulation). To the extent that the third-party materials displaying green gloves specifically discuss the green color of the gloves, they refer only to possible functional benefits, not source identification.[27]

We thus agree with the Examining Attorney that the record does not show third parties using green medical gloves in a way that consumers would perceive the color of the gloves as a mark.[28] The sixth *DuPont* factor is thus neutral in our analysis of likelihood of confusion.

In the unusual circumstances of this case, however, that is not the end of the matter because under the thirteenth *DuPont* factor, we may consider "[a]ny other

---

[27] Examples include Applicant's statement that its "See Green for Safety double-gloving system" for surgical gloves "offers a range of green underglove options designed to help lower the incidence of exposure and improve detection time when perforations [on the outer gloves] do occur" (March 11, 2019 Request for Reconsideration at TSDR 121); and the statements of third-party sellers that 1st Choice Premium Green Nitrile 8 gloves' "high-visibility green color stands out in dark environments, like auto shops and industrial spaces, so your hands are always visible (It's a safety thing)" (March 11, 2019 Request for Reconsideration at TSDR 34); that Gloveworks' SAS Safety glove has a "[h]igh-visibility green Color" (*id.* at TSDR 49); and that SupplyMaster's Diamond Texture Nitrile Gloves' "[h]igh-visibility color ensures hands are always in sight, which increases safety" (*Id.* at TSDR 75).

[28] As noted above, the Examining Attorney made of record a copy of use-based Application Serial No. 87244377 for registration on the Supplemental Register of a mark "consist[ing] of the colors green and white as applied to medical examination gloves, with the color green applied to the entire outer surface of the gloves and the color white applied to the entire inner surface of the gloves." February 27, 2018 Office Action at TSDR 4-5. The application became abandoned, however, and we are unable to associate any of the third-party gloves in the record with the former applicant.

established fact probative of the effect of use." *DuPont*, 177 USPQ at 567. It is well-established that a mark registered on the Supplemental Register would be categorized as weak, *see In re Hunke & Jochheim*, 185 USPQ 188, 189 (TTAB 1975), and we find, under the thirteenth *DuPont* factor, that the third-party non-trademark uses of shades of green on medical gloves tend to impair the cited Supplemental Register mark's ability to acquire distinctiveness, and to limit its scope of protection if it did acquire distinctiveness. Widespread use of a color in a particular market impairs an entity's ability to show that its proposed color mark has acquired distinctiveness in that market. *See Milwaukee Elec. Tool*, 2019 USPQ2d 460354, *25 (cancelling Principal Register registrations of the color red for cutting tools for lack of sufficient evidence of acquired distinctiveness where record showed 20 third-party uses of red for such goods). Therefore, in this specific case, where we decide whether the registration of one shade of color on the Supplemental Register would result in a likelihood of confusion with another shade registered on the Supplemental Register, we find that this evidence, which corroborates the weakness of the cited mark and its limited potential scope of protection, weighs against a likelihood of confusion.[29]

---

[29] We reject Applicant's argument that "the Registrant has essentially admitted that [Applicant's] light green gloves are not confusingly similar to the Registrant's bright green gloves" because to "obtain its registration, the Registrant stated that green gloves are 'common' and included a print-out from Amazon.com showing numerous other parties' green medical gloves – including [Applicant's] own light green, AloeTouch® gloves." 4 TTABVUE 11. A registrant's statements during prosecution that its mark is not confusingly similar to another mark that is later refused registration based on the registrant's mark "have significance as facts illuminative of shade and tone in the total picture confronting the decision maker," *Juice Generation*, 115 USPQ2d at 1675 (internal quotations and quotation marks omitted), but Registrant did not make the cited statements to overcome a Section 2(d) citation of Applicant's mark, and, as a consequence, we give them very little weight here.

### C. Similarity or Dissimilarity of the Marks

"The crux of this appeal centers on the similarity of the marks." *Cook Med.*, 105 USPQ2d at 1381. Under this *DuPont* factor, we consider "'the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.'" *Palm Bay Imps., Inc. v. Veuve Cliquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005) (quoting *DuPont*, 177 USPQ at 567). "When, as in the present case, the marks at issue are non-literal design marks, the similarity of the marks must be decided primarily on the basis of visual similarity." *Cook Med.*, 105 USPQ2d at 1381; *see also Volkswagenwerk AG v. Rose'vear Enters., Inc.*, 592 F.2d 1180, 201 USPQ 7, 9 (CCPA 1979); *Diamond Alkali Co. v. Dundee Cement Co.*, 343 F.2d 781, 145 USPQ 211, 213 (CCPA 1965) ("When symbol marks . . . are being considered, appearance is most significant. Symbols of this kind do not sound.").[30]

"[W]hen comparing the color marks at issue, we are mindful that the test is not whether the marks can be distinguished when subjected to a side-by-side comparison," but "rather whether the marks are sufficiently similar in terms of their appearance and overall commercial impression so that confusion as to the source of the goods offered under the respective marks is likely to result." *Cook Med.*, 105

---

[30] The Examining Attorney argues that confusion is likely because hospital personnel will simply ask "for green gloves rather than differentiating between gloves based on a shade of green." 6 TTABVUE 11. The record suggests, however, that at least at the point of sale, attempts to verbalize the specific shade of the goods seem unnecessary and unlikely because the gloves are often identified by brand name and a specific number. *See, e.g.*, March 11, 2019 Request for Reconsideration at TSDR 33-143.

USPQ2d at 1381 (internal quotation marks and citation omitted). "The proper perspective on which the analysis must focus is on the recollection of the average customer, who retains a general rather than specific impression of marks."[31] *In re i.am.symbolic, llc*, 127 USPQ2d 1627, 1630 (TTAB 2018) (citations omitted). Because the goods are legally identical, "the degree of similarity between the marks necessary to find likelihood of confusion need not be as great as where there is a recognizable disparity between the goods." *In re Bay State Brewing Co.*, 117 USPQ2d 1958, 1960 (TTAB 2016); *see also Bridgestone Ams. Tire Operations LLC v. Fed. Corp.*, 673 F.3d 1330, 102 USPQ2d 1061, 1064 (Fed. Cir. 2012); *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012).

### 1. Summary of Arguments Regarding the Similarity or Dissimilarity of the Marks

We summarize below the Examining Attorney's and Applicant's arguments on the key issue of the similarity of the colors in appearance.

---

[31] It is self-evident that the end users of "medical examination gloves" are doctors, dentists, nurses, and their assistants, who conduct medical examinations. The identity of the actual purchasers of the gloves is less clear, but the record shows that medical gloves are disposable and purchased in bulk, including through websites such as amazon.com. February 27, 2018 Office Action at TSDR 11-17; August 27, 2018 Response to Office Action at TSDR 19-61; March 11, 2019 Request for Reconsideration at TSDR 34-143. These facts suggest that the "average customer" of "medical examination gloves" is not necessarily a medical caregiver, but rather a purchaser of bulk medical supplies. *Cf. Cook Med.*, 105 USPQ2d at 1381 (presuming that the purchasers of medical devices include "physicians and purchasing agents for medical facilities such as hospitals and clinics."). We will consider the similarity of the marks, however, from the perspective of both purchasers of bulk medical supplies and the end users of the goods, as post-sale confusion as well as point-of-sale confusion is recognized. *See, e.g., HRL Assocs. Inc. v. Weiss Assocs. Inc.*, 12 USPQ2d 1819, 1822 (TTAB 1989), *aff'd*, 902 F.2d 1546, 14 USPQ2d 1840 (Fed. Cir. 1990); *In re Artic Elecs. Co.*, 220 USPQ 836, 838 (TTAB 1983).

### a.    The Examining Attorney's Arguments

The Examining Attorney's core argument is that "the parties' marks are both shades of green" and "[c]onsequently, the parties' marks are confusingly similar." 6 TTABVUE 8. Citing TMEP Section 1202.05(e), he argues that "the ordinary language used in the color claim and color location statement in the application to register the applied-for mark and the registration for the cited mark to identify the applied-for color is 'green.'" 6 TTABVUE 9. According to the Examining Attorney, the "applied-for mark is the color green" and the "cited mark is the color green." *Id.*

The Examining Attorney acknowledges that "the application and registration include references to a commercial color identification system," but argues that consumers have no knowledge of the Pantone system or the written descriptions of the respective marks. *Id.* He cites *Cook Medical* in support of the arguments that "the parties' marks are different shades of the same color with the applied-for mark appearing to be a lighter shade of the cited mark," and that "the use of different shades of green with legally identical goods is likely to result in consumer confusion by, for example, hospital personnel simply asking for green gloves rather than differentiating between gloves based on a shade of green." *Id.*

At the oral hearing, the Examining Attorney took the position that the cited registration bars the registration of all shades of green for medical gloves.[32]

---

[32] In that regard, we note that in addition to examining the involved application, the Examining Attorney also examined the application that matured into the cited registration, February 27, 2018 Office Action at TSDR 2, as well as the two then-pending applications to register green color marks that he noted in the first Office Action, which subsequently became abandoned for reasons that are not disclosed in the record. *Id.* at TSDR 4-7. He advised the

### b. Applicant's Arguments

Applicant's core argument is that the "Examining Attorney has effectively granted a prior registrant trademark protection for all green medical gloves, even though the registrant itself claimed only one single shade of green." 4 TTABVUE 5. According to Applicant, the refusal to register "is not supported by precedent; it disregards the prior registrant's own statements during prosecution of its application; and it grants the prior registrant an unfair monopoly on a significant portion of the color spectrum." *Id.*

With respect to the similarity of the colors per se, Applicant argues that "[w]hile certain shades of green may be sufficiently similar to cause confusion, Pantone 2274C and Pantone 7488U are not." *Id.* at 9. Applicant claims that its shade "is a light, pale green," while Registrant's shade "is significantly darker and brighter." *Id.* Applicant cites various federal district court and Board cases for the proposition that "multiple companies can use different shades of a color for the same products without confusion." *Id.* at 12-13.

Applicant argues that *Cook Medical* "is easily distinguishable and it confirms the flaws in the Examining Attorney's reasoning," *id.* at 13, because in *Cook Medical*, the Board held that the registrant's "'blue' mark is not limited to a certain shade of blue and thus covers all shades of blue," including the applicant's teal color, *id.* (citing *Cook Med.*, 105 USPQ2d at 1784), while the cited mark in this case "expressly does

---

panel at the oral hearing that he has refused other applications to register shades of green for medical gloves on the basis of the claimed mark in the cited registration.

not cover all shades of green" and "the parties' marks are expressly different colors that do not overlap." *Id.* Applicant concludes that allowing Registrant's shade of green to bar Supplemental Register registration of Applicant's shade would result in color depletion because "if one entity could claim the exclusive right to all shades of a particular color – based on a registration for one specific shade – competitors would quickly run out of options." *Id.* at 14.

## 2. Analysis of the Similarity or Dissimilarity of the Marks

### a. Defining the Marks

Applicant and the Examining Attorney both cite *Cook Medical* in support of their respective positions regarding the marks, so we will begin with a discussion of the Board's analysis of the first *DuPont* factor in that case. As noted above, the applicant sought registration of a mark that it described in its application as "a translucent, iridescent teal color," while the three cited registered marks were described in the registrations as "the color blue." *Cook Med.*, 105 USPQ2d at 1378.[33] The Board prefaced its analysis of the similarity of the marks with a discussion of the TMEP sections regarding color claim statements and descriptions of color marks.

The Board noted that "[t]he color location statement must include the generic name of the color claimed . . . [and] may also include a reference to a commercial color identification system." *Id.* at 1381 (quoting TMEP Section 807.07(a)(ii))). The Board quoted TMEP Section 1202.05(e) as follows:

> The description of the mark must be clear and specific, use ordinary language, and identify the mark as consisting of

---

[33] The Board focused its analysis on only one of the registrations. *Cook Med.*, 105 USPQ2d at 1380.

> the particular color as applied to the goods or services. If the color is applied only to a portion of the goods, the description must indicate the specific portion. Similarly, if the mark includes gradations of color, the description should so indicate. If the applicant is claiming a shade of color, the shade must be described in ordinary language, for example, "maroon," "turquoise," "navy blue," "reddish orange." This is required even if the applicant also describes the color using a commercial coloring system.

*Id.*[34]

The Board then cited a dictionary definition of the term "teal" in the applicant's description of its claimed mark as meaning "greenish blue" and "a bluish shade of green." *Id.* at 1382. The Board held that the registrant's "'blue' mark is not limited to a certain shade of blue and thus covers all shades of blue, including greenish blue," such that "in the context of the goods in this case, registrant's blue and applicant's teal are similar in color." *Id.*

The Board was careful to note, however, that it did "not mean to suggest by our decision herein that merely because a party obtains a registration for a single color that such registration will block others from using or registering marks for other colors, even similar colors," but held that in the case before it, "the mark is described only as the color 'blue' (applied to a certain part of the goods), and therefore we have considered the mark to be for any shade that would fall under the general term 'blue.'" *Id.* at 1384. The Board explained that it had decided the "appeal based on the

---

[34] The TMEP portions cited in *Cook Med.* remain the same today.

information on the face of the cited registration" and did not "read in limitations" to any particular shade of blue. *Id.*[35]

This case differs from *Cook Medical* in two critical respects. First, although the application at issue in *Cook Medical* contained a drawing showing the claimed mark in color, the registration on which the Board focused contained a drawing that was "lined for the color blue," *id.* at 1378, but did not actually show the claimed color, in a manner consistent with application practice before November 2, 2003. The TMEP currently summarizes the history of that practice as follows:

> Prior to October 30, 1999, an applicant who wanted to show color in a mark was required to use the USPTO's color lining system. The color lining system required applicants to line their drawings using certain patterns designated for certain colors, and to provide a color lining statement describing where the colors appeared. The color lining system was deleted from the rule effective October 30, 1999; however, during a transitional period between October 30, 1999 and November 2, 2003, the USPTO continued to accept drawings that showed color by using this lining system.

TMEP § 808.01(b).

"The [USPTO] subsequently changed its practice and rules. Because color marks are visual, such marks now must be depicted in color drawings, accompanied by: (1) a claim naming the color(s) that are a feature of the mark; and (2) a separate element naming the color(s) and describing where the color(s) appear and how they are used

---

[35] The Board noted that the applicant had not brought a cancellation proceeding under Section 18 of the Trademark Act "seeking to limit registrant's mark to 'sky blue,' 'navy blue' or some other shade of blue (as appropriate), assuming, of course, that such restriction would result in no likelihood of confusion." *Cook Med.*, 105 USPQ2d at 1384-85. *See also Covidien*, 109 USPQ2d at 1699-1700 (discussing Section 18 claim to modify color description)

on the mark." *Cook Med.*, 105 USPQ2d at 1382 n.3 (citing Trademark Rules 2.37 and 2.52(b)(1) and TMEP Sections 1202.05, 807.07-807.07(g), and 808-808.03(f)). Unlike the application and registration in *Cook Medical*, the application and registration here both contain color drawings accompanied by descriptions of the claimed marks.

Second, contrary to the Examining Attorney's claim that the "applied-for mark is the color green" and the "cited mark is the color green," 6 TTABVUE 9, neither the cited registration nor the application describes the claimed color simply by a "general term." *Cook Med.*, 105 USPQ2d at 1384. The registration describes the claimed mark as "the color green Pantone 7488U," while Applicant describes its claimed mark as "the color green (Pantone 2274C)."

The Examining Attorney discounts the significance of the two Pantone designations, arguing that "the ordinary language used to identify both the applied-for mark [and the] cited mark is identical: 'green'," that "[n]either the application to register the applied-for mark nor the registration for the cited mark use any other ordinary language to identify the applied-for color other than the word 'green,'" and that "[h]ere, as in *Cook Med. Tech LLC*, the parties' marks are different shades of the same color with the applied-for mark appearing to be a lighter shade of the cited mark." 6 TTABVUE 11. We disagree with the Examining Attorney's analysis of the nature of the claimed marks.

"[M]arks designating commercial color identification systems, such as PANTONE . . . may appear in connection with a color identifier in the description of the mark, because greater precision in identifying the color may be critical in accurately

describing the mark and such third-party use is an intended use of commercial color-identification-system terminology." TMEP § 808.02. The inclusion of the Pantone designations in the descriptions confirms what the respective drawings show: neither Applicant nor Registrant claims plenary rights in the color green for medical gloves, but only rights "limited to a certain shade." *Cook Med.*, 105 USPQ2d at 1382. At the oral hearing, the Examining Attorney suggested that Applicant could have used the words "light green" to describe its particular shade, but the use of the Pantone designation 2274C rather than a vague description such as "light green" affords "greater precision in identifying the color," TMEP § 808.02, and must be accepted at face value because although TMEP Section 1202.05(e) provides that examining attorneys should require applicants to indicate shades through ordinary language as well as Pantone designations, during prosecution the Examining Attorney did not raise the sufficiency of Applicant's color description under the guidelines in the TMEP and that issue is not before us on appeal.[36]

Because the drawings of the marks at issue here show the particular shades of green and both descriptions use Pantone designations to identify a specific shade of green, in comparing the claimed marks, we cannot simply read one color claim to encompass the other claimed color, as in *Cook Medical*. The cited registration does not categorically preclude the registration of any shade of green for medical gloves.

---

[36] *Cf. Covidien*, 109 USPQ2d at 1699-1700 (discussing sufficiency of color description on Section 18 claim). We note, in any event, that the drawing page controls and the only shade of green covered by the registration is that shown in the color drawing. *Cf.* TMEP Section 807.07(a)(1) (when there is inconsistency between the drawing and the color claimed in the written application, the drawing controls).

We agree with Applicant that this position is untenable. Beyond being inconsistent with the application and registration, it would in essence result in a per se rule, the effect of which would be to remove the color green entirely from the supply of colors available for potential use as marks for medical gloves, even if a particular shade of green is unlikely to cause confusion with the registered mark.[37] Our task is to determine the likelihood of confusion based on all of the relevant evidence in the record, and part of that determination is assessing the degree of similarity (or dissimilarity) between the marks.[38]

### b. Comparing the Marks

We compare the respective shades of green from the standpoint of "the average customer, who retains a general rather than specific impression of marks." *i.am.symbolic,* 127 USPQ2d at 1630. In *Cook Medical*, the Board cited MCCARTHY for the proposition that the issue of the similarity of two color marks "'is really nothing more than a subjective 'eyeball test.'" *Cook Med.*, 105 USPQ2d at 1381 (quoting MCCARTHY § 7:45); *see also In re Burndy Corp.*, 300 F.2d 938, 133 USPQ 196, 197

---

[37] The resulting "color depletion," *cf. Qualitex*, 34 USPQ2d at 1165-66, would be all the more problematic because the Supplemental Register registrant has shown only that its particular shade of green is capable of functioning as a mark, not that it actually does so.

[38] The Examining Attorney correctly argues, however, that consumers are unaware of the descriptions, and that the record does not show that the respective Pantone designations are communicated to consumers when the gloves are displayed for purchase. 6 TTABVUE 9. We thus must compare the shades as they appear in the respective drawings, not as they are described. As Professor McCarthy puts it, "'[t]he legal scope of a trademark in color is not defined in scientifically objective terms, like the claims of a utility patent. The test of infringement is not how many Pantone shades the defendant is distant from the senior user's mark, but whether the reasonably prudent customer would be likely to be confused as to source, sponsorship, affiliation or approval.'" *Cook Med.,* 105 USPQ2d at 1379 (quoting MCCARTHY § 7:45:70).

(CCPA 1962) ("In our view, this case must be decided primarily on the basis of visual similarity of the marks. The marks are not word marks and are not capable of being spoken."). The Board noted in *Cook Medical* that "Professor McCarthy has characterized these types of likelihood of confusion comparisons as 'some of the most unpredictable and troublesome issues of infringement in trademark law,' and noted that these kinds of issues exemplify 'shade confusion.'" *Cook Med.*, 105 USPQ2d at 1379 (quoting MCCARTHY § 7:45).[39]

In *Qualitex*, the Supreme Court expressed a far more optimistic view of the factfinder's ability to compare color shades. The Court rejected the argument that "if the law permits the use of color as a trademark, it will produce uncertainty and unresolvable court disputes about what shades of a color a competitor may lawfully use" and that "competitors and courts will suffer from 'shade confusion' as they try to decide whether use of a similar color on a similar product does, or does not, confuse consumers . . . ." *Qualitex*, 34 USPQ2d at 1164. The Court observed that it did not believe "that color, in this respect, is special," and that "[c]ourts traditionally decide quite difficult questions about whether two words or phrases or symbols are sufficiently similar, in context, to confuse buyers." *Id.* The Court expressed confidence that fact finders were capable of applying to colors the same standards for similarity

---

[39] The Board quoted Professor McCarthy's opinion that "[s]ome courts blithely assume that because there are hundreds of scientifically identifiable shades, consumers can distinguish between them to identify hundreds of different commercial sources by fine variations in shade and that therefore colors will never be 'depleted' and no one will be confused. . . . Anyone who has gone shopping in a paint store and been unable to distinguish between fine variations of shades will appreciate the attitude of a judge or juror asked to find that 'yellowish red' does not infringe 'bluish red'. . . ." *Cook Med.*, 105 USPQ2d at 1379 (quoting MCCARTHY § 7:45:70).

used in cases involving traditional marks. *Id.* The Court cited three Board decisions, *Youngstown Sheet & Tube Co. v. Tallman Conduit Co.*, 149 USPQ 656, 657 (TTAB 1966); *Amstead Indus., Inc. v. West Coast Wire Rope & Rigging, Inc.*, 2 USPQ2d 1755, 1760 (TTAB 1987); and *In re Hodes-Lange Corp.*, 167 USPQ 255, 256 (TTAB 1970), in support of its view. *Id.* at 1165.

The Court also noted that in comparing color marks, the factfinder could take into account the conditions surrounding the marks' exposure to consumers, including "replicating, if necessary, lighting conditions under which a colored product is normally sold." *Qualitex*, 34 USPQ2d at 1164. In *Cook Med.*, the Board engaged in this sort of analysis when it noted that under certain lighting conditions, "the translucence [of the applicant's teal mark] may not be perceptible and the iridescence may result in the teal being perceived as more blue than green," and that the involved colors ran "the length of the products, which are narrow in shape," as shown below:



(applicant's goods)

(registrant's goods)

The Board found that the appearance of the marks in this manner on the registrant's goods "may limit the ability to differentiate between the shades of blue." *Cook Med.*, 105 USPQ2d at 1383 & n.4.

The nature of the goods here, and the most common manner of their display, show that the concerns regarding lighting and the visibility of the marks that influenced the Board's finding of confusing similarity between the marks in *Cook Medical* are not present in this case. The claimed marks here are not used on only one part of the goods. Applicant's mark is "applied to the gloves" while Registrant's mark is "applied to the exterior of gloves," and the respective drawings show that both marks cover the entire surface of the goods. The gloves are frequently exposed, both at the point of sale of the goods and post-sale while in use, in a manner that make their surfaces clearly visible, and the resulting prominence of the claimed marks reduces the risk that lighting conditions or other factors may affect the ability of consumers to distinguish between the respective shades of green. Indeed, as noted above, some sellers of green gloves expressly tout the visibility of the color as a desirable feature of the goods. In any event, as with all other marks, "we do not consider how Applicant and Registrant actually use their marks in the marketplace, but rather how they appear in the registration and the application. We must compare the marks as they appear in the drawings . . . ." *In re Aquitaine Wine USA, LLC*, 126 USPQ2d 1181, 1186 (TTAB 2018).

Against the backdrop of the prominent display of the claimed marks on the goods, and acknowledging the inherent subjectivity of our determination, we find that there

are significant differences in visual appearance between Registrant's shade of green and Applicant's shade of green. As shown in the registration drawing, Registrant's claimed shade is a bright, attention-grabbing hue that is squarely within the green color family and would be perceived and recalled as such:



Even when not viewed in proximity (or in comparison) to Registrant's mark, Applicant's claimed mark, as shown in the application drawing, appears as a subdued, pale shade that would be perceived as somewhere on the outer periphery of the green color family:



We find that the claimed marks would be viewed and remembered, at most, as distant relatives in the green family. The two shades of green "'must be considered . . . in light of the fallibility of human memory' . . . .'" *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1085 (Fed. Cir. 2014) (quoting *San Fernando Elec. Mfg. Co. v. JFD Elecs. Components Corp.*, 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977)). We find that consumers with an imperfect or even dim recollection of Registrant's bright shade,

and who have been exposed to the use of multiple other shades of green on medical gloves and are then exposed to Applicant's pale shade, are not likely to view the two shades as similar, or to view gloves bearing them as being the product of one and the same producer. We find that the claimed marks are distinct and therefore dissimilar, and the first *DuPont* factor thus strongly supports a finding that confusion is not likely.

### D. Balancing the *DuPont* Factors

Against the backdrop of the use of multiple shades of green in connection with the subject goods, which suggests a narrow scope of potential protection for the registered Supplemental Register mark, the difference in the appearance of the respective claimed marks is significant enough to make confusion unlikely even though the involved shades of green are used on identical goods sold through identical channels of trade to identical customers. *Cf. Champagne Louis Roederer S.A. v. Delicato Vineyards*, 148 F.3d 1373, 47 USPQ2d 1459, 1460 (Fed. Cir. 1998) (the Federal Circuit has "upheld Board determinations that one *DuPont* factor may be dispositive in a likelihood of confusion analysis, especially when that single factor is the dissimilarity of the marks"); *Kellogg Co. v. Pack'em Enters., Inc.*, 951 F.2d 330, 21 USPQ2d 1142, 1144-45 (Fed. Cir. 1991). We find that consumers are not likely to believe that medical gloves in Applicant's pale shade of green originate with, or are licensed or sponsored by, the same company that produces or sells medical gloves in Registrant's bright shade of green.

**Decision**: The refusal to register Applicant's mark on the Supplemental Register is reversed.